FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 10 2010 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
GARY H. RAMEY, ET AL.,

                                 Plaintiffs,

          - against -

DISTRICT 141, INTERNATIONAL
ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, ET AL.,

                                 Defendants.
----------------------------------------------------------- X

**MEMORANDUM AND ORDER**

99-CV-4341 (BMC)(RML)

**COGAN**, District Judge.

This is a suit by airline mechanics currently or formerly employed by US Airways ("US Air") against their labor union, the International Association of Machinists and Aerospace Workers; their local, District 141; and various union officials (collectively, "the IAM" or "defendants"). In a trial solely on the issue of liability, a jury found that the IAM had breached its fiduciary duty to plaintiffs by agreeing to strip them of their seniority rights to help effectuate the merger of Eastern Airlines and US Air. Judge Korman, to whom this case was previously assigned, thereupon entered an injunction requiring restoration of the seniority rights and awarded attorneys' fees of nearly half-a-million dollars.

After a subsequent bench trial on damages, I awarded the remaining 26 plaintiffs[1] damages for breach of the duty of fair representation under the Railway Labor Act ("RLA"), 45 U.S.C. § 141, *et seq*, and denied their second application for attorneys' fees from the damages

---

[1] There were originally 66 plaintiffs, but some of their claims were resolved before trial.

phase of the case.[2] The Second Circuit vacated and remanded for reconsideration the damages awarded as to four of the 26 plaintiffs: Dean Droz, James M. Lowe, Thomas O'Grady, and Raymond Simuta (the "plaintiffs"). Specifically, the Circuit instructed me to reconsider whether they had adequately sought to mitigate their damages. It also remanded for reconsideration the denial of additional attorneys' fees. See Ramey v. Dist. 141, Int'l Ass'n of Machinistists and Aerospace Workers, Nos. 08-5959-cv, 09-2143-cv, 362 Fed. Appx. 212 (2d Cir. Jan. 27, 2010) [hereinafter "Ramey II"].

The Court has carefully considered the Mandate of the Second Circuit, and has received and reviewed supplemental submissions from the parties. For the reasons set forth below, the Court adheres to its prior determinations on both of the issues on remand.

# I
# MITIGATION AS TO THE FOUR PLAINTIFFS

## A. Background

Although familiarity with the case's background is assumed, some context is necessary. First, the four plaintiffs whose claims have been remanded for reconsideration each had enough seniority, once it was restored, with US Air, that they could have maintained their positions by accepting a transfer to another location within the US Air network. I found, however, that this was beyond the scope of a wrongfully terminated employee's duty to mitigate his damages, a finding that the remand did not disturb. Therefore, given that another, equivalent, position with US Air was not an option, the question became whether it was reasonable for the furloughed employees to make no efforts to seek new employment with another airline. I found that it was because of their ages. When furloughed, the youngest of the four plaintiffs was four years from

---

[2] Familiarity with the facts as set forth in this Court's Findings of Facts and Conclusions of Law, dated October 21, 2008, ("Findings of Fact"), and Memorandum and Order, dated April 27, 2009, ("M&O"), as well as the Second Circuit's prior decision, is assumed. See Ramey v. Dist. 141, Int'l Ass'n of Machinists and Aerospace Workers, 378 F.3d 269, 274-76 (2d Cir. 2004) [hereinafter "Ramey I"].

retirement. Simuta was 61; Droz and O'Grady were 62; and Lowe was 64. Each testified that they planned on working until about 65, when they would qualify for maximum Social Security benefits. This meant that, if any job search were immediately successful, Simuta would have worked another four years; Droz and O'Grady another three; and Lowe another year.

I relied on testimony from Simuta to illustrate the predicament that he, Droz, O'Grady and Lowe faced. At trial, Simuta had explained that getting a job with another airline would have meant losing all seniority, regressing to the most junior level, "working midnights" and "doing [] grunt work," as he and the other plaintiffs had at the inception of their careers some 40 years earlier. Defendants offered no evidence that this analysis, by someone who had worked in the industry for decades, was wrong, and I did not consider it reasonable for Simuta to start working the midnight shift doing "grunt work" at his age. Moreover, even if willing to accept such a diminished position, Simuta was skeptical that any other airline would hire him knowing that he was within a few years of retirement. Again, defendants offered nothing to contradict this, and I accepted it as accurate.

The other three plaintiffs faced as great, if not an even greater challenge, as they were all older than Simuta when furloughed. Especially since defendants put in no evidence that other airlines had available positions, or that they would be reasonably likely to hire these four plaintiffs for any positions that approached the level of seniority they had obtained, I found that defendants had failed to meet their burden of showing that plaintiffs acted unreasonably. Although I singled out Simuta's testimony in the Findings of Fact, Droz, O'Grady and Lowe had testified similarly at trial. O'Grady and Droz were both furloughed from positions at LaGuardia. O'Grady was 63 when he put in for retirement, which he testified was a year-and-a-half before he had planned to, shortly after US Air's second bankruptcy, in order to protect his pension

3

benefits. In order to maintain his position as a lead mechanic, Droz transferred to Providence, Rhode Island, and only retired when he would have had to move from the afternoon to the "graveyard shift," which would have been more physically demanding. "Snow and bull work in the sense that that's where all the maintenance is performed. . . . [W]hen all the planes are down, that's when all the brakes and tires are changed, all the heavy checks are done, a lot more than second shift. We don't do that in second shift." He was 62-years-old. Finally, after Lowe retired at 64, he testified that he made no efforts to find another job with a different airline because he thought it would be a useless exercise. "I was 64 years old, and I lived out in the country, and I had already made a move from [Reagan National Airport]. I certainly didn't want to go back to National, and at my age, I thought it was [] very unlikely that I probably could get another job."

Defendants, who bore the burden to show that plaintiffs acted unreasonably, offered nothing to address the issue of their age or the availability of alternative, seniority-comparable employment. They simply argued that plaintiffs' failure to seek out new employment proved by itself that plaintiffs had not met their duty to mitigate damages.

Reasonableness, however, is a question of fact that turns on the individual characteristics of the plaintiffs. The undisputed evidence showed that plaintiffs' ages made it extremely unlikely that any of them would be able to get another position, and any such position would have been a significant step down. Plaintiffs' testimony bore out my own practical knowledge, gained through everyday experience, that people in their 60s do not regularly start entry-level careers unless they have no alternative and an employer is highly unlikely to hire them unless it too has no viable alternative. Accordingly, I concluded that "even if these plaintiffs managed to get another job they would have been at the bottom of the seniority list of their new employer

4

and as a result would likely have been made to work the least desirable shifts doing the least desirable work, essentially starting their careers over again despite being so close to retirement age." Findings of Fact, at 9. Because defendants failed to address, much less offer rebuttal evidence, as to the daunting challenges these senior employees would face in seeking new employment, I found that they did not meet their burden of showing that plaintiffs' actions were unreasonable. Id.

The Second Circuit found I erred "in giving insufficient attention to these statements [that they had not made any efforts to look for other work] by Droz, O'Grady, Lowe, and Simuta with respect to their failure to mitigate damages." Ramey II, 362 Fed. Appx. at 216. "[T]he admissions by these plaintiffs that they made no efforts to mitigate damages seems [] to be quite damaging" and were "not give[n] adequate consideration." Id. Its remand is therefore limited to consideration of whether defendants met their burden to show that plaintiffs made no "*reasonable* efforts to obtain work" given that neither Droz nor O'Grady nor Simuta nor Lowe made any efforts to seek "other work." Id. (emphasis added) (quoting Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998)) [hereinafter "Greenway"].

**B.  Legal Standard**

Under the "Greenway exception," an employer can show that an employee failed to meet his duty to mitigate "if it can prove that the employee made no reasonable efforts to seek [substantially comparable] employment." 143 F.3d at 54.[3] In order to trigger the exception, the employer must make a threshold showing that the employee's efforts were unreasonable. Broadnax v. City of New Haven, 415 F.3d 265, 268-69 (2d Cir. 2005). "Greenway makes clear that the exception it creates is merely an alternative evidentiary route by which a defendant can

---

[3] IAM can be regarded for purposes of this analysis as a former employer, although it never employed plaintiffs directly.

5

prove that the plaintiff did not fulfill the duty to mitigate, not a burden-shifting device." Id. at 268; see Picinich v. United Parcel Serv., 236 Fed. Appx. 663, 665-66 (2d Cir. June 11, 2007) (vacating and remanding for reconsideration in order to ensure that the district court required defendants to show that plaintiff "failed to engage in any reasonable efforts to mitigate) (emphasis in original).

The wrongfully terminated employee's duty to mitigate is minimal. He is not required to go into another line of work or accept a demotion. Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1997) (quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32, 102 S. Ct. 3057 (1982)). Thus, before an employer can invoke the exception, and avoid showing the availability of comparable employment, it must first show "the plaintiff made no reasonable efforts to seek alternative employment." Broadnax, 415 F.3d at 270; see Press v. Concord Mortg. Corp., 08 Civ. 09497, 2010 U.S. Dist. LEXIS 81952, at *3-4 (S.D.N.Y. Aug. 11, 2010) (finding that defaulting defendants, who "failed to offer any response to [plaintiff's] allegations whatsoever," did not meet their burden and awarding backpay).

The employer's burden is a substantial one. It is not satisfied by mere proof "that there were further actions that plaintiff could have taken in pursuit of employment." Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 580 (S.D.N.Y. 2010) (quoting EEOC v. Kallir, Philips, Ross, Inc., 420 F. Supp. 919, 925 (S.D.N.Y. 1976), and collecting cases). Rather, the defendant must make an affirmative showing that "the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment. The range of reasonable conduct is broad and the injured plaintiff must be given the benefit of every doubt in assessing her conduct." Id. (quoting Kallir, Philips, Ross, 420 F. Supp. at 925)); see, e.g., Raymond v. Boehringer Ingelheim Pharm., Inc., 653 F. Supp. 2d 151, 157-58 (D. Conn. 2009); see also

Ellerman Lines, Ltd v. The President Harding, 288 F.2d 288, 290 (2d Cir. 1961) (explaining that the standard of reasonable actions for tort victims "is lower than in other branches of the law" and, accordingly, plaintiff "ought not be deprived of recovery if [his] conduct came within the range of reason, even if the full light of reason was not, in fact, brought to bear.").

Reasonableness is a question of fact that requires "consideration of such factors as the individual characteristics of the claimant and the job market, as well as the quantity and quality of the particular measures undertaken by the plaintiff to obtain alternate work." Dailey, 108 F.3d at 456-57 (internal quotations and citations omitted) ("[T]he jury reasonably could have found that plaintiff's six month job search in New York was diligent, and that her decision to attend school was also reasonable in light of both the job market in New York and plaintiff's depleted financial resources."); see Hawkins, 163 F.3d at 695-96 (describing broad range of reasonable efforts, including self-employment). The factfinder must bring to bear its practical experience in weighing these factors. See, e.g., Hall v. Family Care Home Visiting Nurse & Home Care Agency, LLC, No. 3-07-cv-0911, 2010 WL 1487871, at *2 (D. Conn. Apr. 12, 2010) (denying summary judgment because a reasonable jury could find it reasonable that plaintiff, who was pregnant or had young children during the period in question, abandoned her efforts to find a job outside the home after a year in order to work for her husband); Longo v. Breda Transp., Inc., 04. Civ. 10241, 2008 U.S. Dist. LEXIS 30590, at *11-12 (S.D.N.Y. Mar. 31, 2008); Kallir, Philips, Ross, Inc., 420 F. Supp. at 925-27 (finding that defendant failed to meet its burden to show that circulating her resume informally among professional contacts was an unreasonable job search technique for plaintiff, whose skills and training were limited to her specialized field of pharmaceutical advertising and who faced a terrible job market in that field).

## C. Application

Defendants' argument rests entirely on the assumption that because plaintiffs made no efforts to find new jobs, their actions were *per se* unreasonable. "Plaintiffs Droz, O'Grady, Lowe, and Simuta uniformly testified that they did not expend any effort to find alternative employment, and thus should be foreclosed from seeking back pay, without any further showing by the defendant." Defs.' Mem. at 11. This is not so. Reasonableness turns on consideration of the characteristics of the individual plaintiff, which includes their age and the job market they face. See Dailey, 108 F.3d at 456-57. Although it might usually be the case, there is no threshold requirement that some job search must have been undertaken in order for a plaintiff's efforts to be deemed reasonable. See Broadnax, 415 F.3d at 268-69 (rejecting defendant's argument that, because plaintiff made no efforts to seek alternative employment, it was entitled to judgment as a matter of law under Greenway, and explaining that the initial burden to show the reasonableness of the employee's search efforts remains the employer's).

Defendants argue that where plaintiffs have made no efforts to seek employment, their individual characteristics should not be considered. I disagree. This would accomplish indirectly what defendants cannot do directly – imposing a threshold requirement that plaintiffs show some job search before the reasonableness of their actions may be considered. See also Mugavero, 680 F. Supp. 2d at 580-81 (explaining that "[d]efendants err in placing the burden on Mugavero to prove that her mitigation efforts were sufficient, and offer no independent evidence that Mugavero's conduct was so deficient as to constitute an unreasonable failure to seek employment.") (internal citations and quotations omitted); Longo, 2008 U.S. Dist. LEXIS 30590, at *11. As soon as a plaintiff admitted that he had not undertaken any job search efforts, his

8

actions would be *per se* unreasonable. This would contradict the well-established rule that reasonableness is a fact-based determination that turns on the characteristics of the individual and the job market. See Dailey, 108 F.3d at 456-57; see, e.g., Hall, 2010 U.S. Dist. LEXIS 36556, at *7; Mugavero, 680 F. Supp. 2d. at 581.

Moreover, the cases defendants rely on not only emphasize that it is the employer who bears the initial burden to show that the employee's mitigation efforts were unreasonable, but also apply the fact-based rubric defendants would discard. See, e.g., Abercheski v. Oracle Corp., 650 F. Supp. 2d 309, 313 (S.D.N.Y. 2009) (explaining that the question of whether plaintiff "'acted reasonably in attempting to gain other employment' . . . is only addressed once the employer has carried its burden" to show that "[plaintiff] 'made no reasonable efforts' to secure employment") (quoting Hawkins, 163 F.3d at 695). In NLRB v. Ferguson Elec. Co., 242 F.3d 426, 435-36 (2d Cir. 2001), the Second Circuit found that defendant failed to meet its burden "[b]y propounding its bare argument, without supporting facts or evidence" that the wrongfully terminated employee made insufficient efforts to mitigate, expressly rejecting any burden-shifting or imposition of a rule that where a union limits those employers at which a paid organizer can seek a position there has been insufficient mitigation.[4] Similarly, Hine v. Minetta, 238 F. Supp. 2d 497 (E.D.N.Y. 2003), and Abercheski, both not only emphasize the employer's burden but make fact-specific determinations as to what a reasonable fact-finder could conclude based on the individual plaintiff's characteristics. Thus, in Hine, where the jury had "totally rejected" plaintiff's evidence that she was unable to continue working as an air-traffic controller, the court affirmed the advisory verdict denying backpay because "[a] reasonable jury could have found that the plaintiff was physically and emotionally able to find other suitable employment;

---

[4] Defendants' reliance on NLRB v. Mastro Plastics Corp., 354 F.2d 170, 175 (2d Cir. 1965), is similarly unavailing. There, the Second Circuit held that "the burden of persuasion as to willful loss should remain on the employer." Here, however, there is no issue of "willful loss."

that she totally failed to attempt to mitigate her back pay damages in any manner; and that she was content to remain at home with her four young children, having received the sum of $310,000 from the government." Finally, in <u>Abercheski</u>, the court found that defendant met its burden only as to plaintiff's failure to continue seeking work comparable to her previous job after accepting a waitress position. There, plaintiff relied on her status as a Title VII litigant, including her inability to list defendant as a reference or conceal her dispute, to excuse her efforts. The facts here, where plaintiffs have presented uncontested evidence that as senior employees with only a few years left to retirement they were skeptical any employer would hire them, are distinguishable.

Thus, the statements that plaintiffs did not seek other work are, as the Second Circuit noted, "damaging," but when viewed in a proper evidentiary context, all that means is that defendants met their burden of going forward on failure to mitigate by showing that plaintiffs had not sought other employment. If plaintiffs had offered nothing in addition, defendants might well have prevailed. But plaintiffs responded with a persuasive business justification for not seeking comparable employment – no one was going to hire people at their age, on the cusp of retirement, for employment comparable to that of which defendants had deprived them, and thus there were no jobs available for them.

I gave that evidence enough credit so that the burden then shifted back to defendants to show plaintiffs were wrong. If the facts supported it, for example, defendants could have called an economist or vocational counselor to disprove plaintiffs' contention by showing that comparable employment was available. They could have offered job postings from other airlines, if there were any, seeking to hire airline mechanics who were two or three years from retirement (unlikely as that seems). But defendants offered nothing at all – certainly no

10

"individual characteristics of the claimant and the job market." Dailey, 108 F.3d at 456 (internal quotations omitted). They therefore did not meet their burden of proving failure to mitigate. The absence of any evidence from defendants was particularly telling because of who they are – the union that represents airline mechanics across the entire industry. If there were jobs for these plaintiffs out there, one would think the IAM would know about them.

This is not to say that a defendant employer must always show job availability to prove failure to mitigate. The factfinder's common sense takes over at a point that is reasonably easy to discern – a 35 year old wrongfully terminated carpenter needs to show that he tried to find another job but could not, because common sense dictates that there is a reasonable chance that there might be a comparable job out there. A 65-year wrongfully terminated construction laborer, on the other hand, probably does not need to look for a comparable job because there seems but a slim chance that he would get one. These examples are illustrative of the law's recognition that the employee needs to show reasonable effort, not exhaustive effort, and that there is no requirement to undertake an exercise in futility. See, e.g., Dailey, 108 F.3d at 456-57; Watson v. E.S. Sutton, Inc., 02 Civ. 2739, 2005 U.S. Dist. LEXIS 31578, at *47-49 (S.D.N.Y. Sep. 6, 2005) (finding that plaintiff had satisfied her duty to mitigate where, after "a lengthy and thorough search for employment in the fashion industry" that met with "an utter lack of success" she began a lower-paid career in photography). This is especially true because, it must be remembered, it was defendants' tortious conduct that deprived these plaintiffs of their livelihood in the first place.

I accepted plaintiffs' argument as a factual matter because it seemed to me to fully comport with common sense. The youngest of the four plaintiffs was only four years from retirement when he was laid off. The same reasoning applies to the other three plaintiffs. Their

11

age alone was sufficient to support an inference that any job search for a substantially equivalent position at another airline would have been futile. See, e.g., Whittlesey v. Union Carbide Corp., 742 F.2d 724, 729 (2d Cir. 1984) (affirming trial court's award of four years of front pay, to compensate for lost wages and benefits, from trial to when plaintiff would reach compulsory retirement age, and noting that the award "did not involve some of the uncertainties which might surround a front pay award to a younger worker" who might be able to find new employment); Koyen v. Consol. Edison Co. of N.Y., Inc., 560 F. Supp. 1161, 1169 (S.D.N.Y. 1983) (noting that "[i]t can hardly be disputed that at his age [68] the likelihood of re-employment is minimal" and awarding front pay). As Simuta, the youngest plaintiff testified, "I doubt if anybody would have hired me at that stage and invested money in me to continue on." Similarly, he testified: "[I]f I did get a job with another airline to go working midnights doing, basically, the grunt work and starting my career over again at 62 when I should have been finishing my career." There is no obligation that a wrongfully terminated employee accept such a demotion. See Ford, 458 U.S. at 219; Dailey, 108 F.3d at 456.

Defendants have ignored these realities. They presented no evidence at trial and have advanced no new arguments on remand as to why employees within four years of retirement were incorrect to believe that it would be impossible for them to secure any position at a new airline, much less a position at the level to which they had advanced after decades of service with US Air. In short, defendants left undisputed plaintiffs' contentions that any job search at their ages would have been in vain and that even if successful, any position would be significantly less desirable than the one taken from them.[5]

---

[5] Defendants point to Lowe's testimony that he did not seek other work because he "had retirement" and "considered that like another job" as evidence that he failed to mitigate. Accepting this contention would, however, require ignoring Lowe's subsequent explanation that he did not look for another position because he had moved out "to the country" and was 64-years-old, just one year away from retirement.

Because the determination of reasonableness turns on the circumstances of the individual plaintiffs in relation to the available job market, I adhere to my prior finding that defendants have not met their burden to show that it was unreasonable for these four plaintiffs, each within a few years of retirement, to have undertaken no job search.

## II
## ATTORNEYS' FEES

Some retreading of this case's familiar background is again necessary. The only fees at issue here are those incurred winning damages for the individual plaintiffs for harm they suffered prior to the injunction, which was issued after the jury returned a favorable verdict on liability. The injunction "was the primary relief that plaintiffs had sought."[6] M&O, at 2. In support of his successful motion for attorneys' fees for the liability phase of the case, plaintiffs' counsel stated that the injunction constituted "not merely substantial, but *complete success*," emphasizing in his reply memorandum that plaintiffs "have *now unqualifiedly prevailed*." (emphasis added). Accordingly, Judge Korman awarded $493,724.94 in attorneys' fees and costs for the liability phase of the case under the common benefit theory, finding that by vindicating their rights to select the union of their choice, the plaintiffs had "rendered a substantial service to [their] union as an institution and to all of its members." Mem. & Order dated June 23, 2005, at 2 (quoting Hall v. Cole, 412 U.S. 1, 8, 93 S. Ct. 1943 (1973)).

After entry of the injunction, the only remaining issue in the case was the amount of incidental damages needed to compensate the individual plaintiffs for harm they suffered before entry of the injunction. Those damages, as explained in the MD&O, at 15, "merely make the injunction fully effective. The injunction remedied the deprivation caused by defendants' breach

---

[6] That injunctive relief was the heart of that sought by plaintiffs has been acknowledged throughout this case. See, e.g., Mem. Decision & Order dated Feb. 7, 2007, at 13 ("Central to this case is a request for extensive injunctive relief.") [hereinafter "MD&O"].

13

from the moment it issued and continuing into the future. Damages are required only because the injunction could not compensate for injuries that incurred before its issuance which are now required to make the remedy complete." Following a four-day bench trial on damages and post-trial submissions from both parties, the 22 individual plaintiffs were awarded $2,252,414.00. Plaintiffs then sought another $462,278.36 in fees and costs for that phase of the litigation.[7]

In the original M&O, I explained that attorney's fees are only available under the "common benefit" doctrine where the litigation "confers a *substantial* benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." Rodonich v. Senyshyn, 52 F.3d 28, 31-32 (2d Cir. 1995) (emphasis added, internal citations and quotation marks omitted). In Rodonich, the Second Circuit held that the common benefit doctrine expanded beyond the scope of "concrete benefits that flow from an award of equitable relief alone or in combination with damages" and "require[d] only that (1) there be benefits in common arising from the plaintiff's lawsuit, and (2) that those benefits be substantial enough to warrant a fee award." Id. at 34. I relied on Rodonich for the proposition that it was for the "district court to determine whether there were in fact benefits in common for the union membership and whether those benefits were substantial, i.e., whether the membership received a proportional benefit which justifies spreading the costs of litigation." M&O, at 5 (citing Rodonich, 52 F.3d at 35).

Seeking to flesh out the substantiality prong of the common benefits requirement, I cited the Sixth Circuit's decision in Argentine v. United Steelworkers of America, 287 F.3d 476 (6th

---

[7] As the M&O highlighted, Magistrate Judge Levy had previously noted that plaintiffs' subsequent application for "substantial damages" led the court to "question[]" whether counsel's statements about the injunction constituting complete success were "genuine." "If plaintiffs had not achieved complete success as of September 2003, the Court might have decided the attorney's fees motion differently." Id. at 3 (internal quotations omitted).

14

Cir. 2002). I explained that "[t]he Sixth Circuit has similarly noted that '[t]he central issue for a court in determining the applicability of the common benefit theory is whether the members of the [union] shared in the benefit of the suit in the same way as the plaintiff[s].'" M&O, at 5 (quoting id. at 489). I used Argentine to highlight that simply because plaintiffs have vindicated their rights, which undisputedly benefits the union as a whole, does not mean that they are entitled to win recovery for the full expense of litigation. The question, rather, is whether the "benefits [are] substantial enough to warrant a fee award." Rodonich, 52 F.3d at 34.

In Argentine, the Sixth Circuit denied prevailing plaintiffs attorneys' fees because the union membership did not benefit from their efforts "in the same way as the Plaintiffs," who "received more than $400,000 in damages [] in which members of the Local cannot share." 287 F.3d at 489. The decision that members and plaintiffs did not benefit in the "same way" was not dictated by fact that plaintiffs won damages, but by the discrepancy between the amount of damages and the value of the attorneys' fees; a discrepancy which bore out the Rodonich court's warning that "an award of money damages may so far exceed the benefits to the rest of the membership as to make the award of any attorney's fees unjust." 52 F.3d at 35. In other words, the Argentine court denied attorneys' fees not because plaintiffs won money damages and the rest of the union membership did not, but because the discrepancy evidenced that the benefit to the rest of the membership was not "substantial enough" to justify spreading the cost of litigation. My purpose in citing the case was to spotlight the factual similarities between that case and this one, where the individual plaintiffs won more than $2 million in damages for harm that they suffered and that will not be distributed amongst the rest of the union membership.

The Second Circuit was concerned that my holding reflected an attempt to reformulate the common benefits rule set forth in Rodonich to require that "plaintiffs and the union members

15

must share in the benefit of the suit in the same way," a proposition which "taken to its logical extension suggests that an award of damages could never provide a common benefit to the union membership." Ramey II, 362 Fed. Appx. at 317 (internal quotations and alterations omitted). I fully agree with the Circuit that there can be no requirement of equal or even near-equal benefit for the common benefits rule to apply. Such a requirement was neither consistent with my understanding nor the standard that I applied. The issue is not strictly comparative benefit; it is whether the union membership as a whole received a substantial benefit. I cited Argentine only for the principle of substantiality – the union members must receive a substantial benefit. The reference to the damages that plaintiffs were receiving merely indicated that the rest of the union members would not receive that benefit.

Accordingly, I denied plaintiffs' fee request for the damages phase of the litigation because that phase of the case brought no benefit to the union membership. As Judge Korman found, the injunctive relief won at the liability phase was the "primary relief" sought. Once it was secured, as I found in the original M&O, the IAM had been deterred and the chill dispelled. At that point, the common benefit had been achieved. This corresponds with the statements of plaintiffs' own counsel, who declared the injunction "complete success" on the fair representation claim, and follows logically from the MD&O's distinction between the damages and the injunction. As explained therein, "[d]amages are required only because the injunction could not compensate for injuries that [individual plaintiffs] incurred before its issuance." Id. at 15. The benefits of the damages portion of the litigation accrued only to the individual plaintiffs; the damages were awarded to the plaintiffs to compensate them for the harm that they suffered before the injunction issued. "[P]laintiffs' continued prosecution of this matter following the

jury's determination of liability and the Court's imposition of an injunction did not provide any such benefit [to the union membership]." M&O, at 6.

On remand, plaintiffs contend that it was the damages award that put the teeth into the common benefit that was secured by the injunction.

> Elimination of the 'chill' upon Plaintiffs', and their fellow members', exercise of their union rights – the benefit both Judge Korman and this Court recognized as having resulted from Plaintiffs' successful prosecution of this litigation – was not effected merely by the jury's 2003 verdict, or the restoration of Plaintiff's seniority. Compelling Defendants to pay damages was what finally did it.

Pls.' Mem. at 9 (internal citations and alterations omitted).

This is indeed the key issue, but I remain unconvinced. As plaintiffs themselves acknowledge, it was the verdict and injunction that restored their seniority and ensured that other union members would be free from any fear of reprisal for choosing the bargaining representative of their choice. The damages award was purely retroactive, restoring losses incurred before the injunction went into effect. The purpose of an award of attorneys' fees is not to punish, but to equitably spread the cost of litigation across those who have benefitted from it. See Mem. & Order dated March 15, 2005, at 1-2 (internal citations omitted); see also Rodonich, 52 F.3d at 32-33 (internal citations and quotations omitted). Plaintiffs have presented no new facts that would indicate the damages award in this case brought any substantial benefit to the rest of the union membership.[8]

I have no doubt that the issuance of injunctive relief and the prior award of nearly half-a-million dollars in attorneys' fees bestowed a substantial benefit on the union membership at large and thus was appropriately spread amongst them. The union leadership, which is charged with

---

[8] Another indicator of the incidental nature of the damages award, which thereby tends to show that the union membership did not receive a substantial benefit from it, is that the damages issues were tried to the Court. Plaintiffs had demanded a jury trial on damages, but I determined that the damages were "incidental" to the injunctive relief, which was "plaintiffs' primary goal" and thus there was no right to a jury trial, a determination that plaintiffs did not challenge on appeal. MD&O at 14-15.

17

protecting its members, was found to have instead betrayed them, and the cost of that betrayal was spread among all the union members, not only by readjusting seniority rights and paying plaintiffs' attorneys' fees, but also by what are likely to have been equal or more substantial attorneys' fees incurred by the defendants themselves. If any ruling of this Court was going to have a deterrent effect on future misconduct and thus protect all union members, it was the award of injunctive relief and substantial attorneys' fees. That prior judgment was beyond embarrassing to the leadership – it was an abject lesson in how not to treat your members and the costs that flow from ignoring your obligations to union members.

However, as plaintiffs' attorney himself characterized it, this "complete success" resulting in the prior award makes it all the more unlikely that union members would receive a "substantial" benefit from the individual damages awarded to the plaintiffs here. The lesson has already been learned if it was going to be learned. "Piling on" by increasing the detriment to other union members is thus not going to bestow a "substantial" additional benefit. I suppose that, in a theoretical sense, every extra dollar of pain inflicted could increase the deterrent effect, but in my view, the injunction and the initial award put us at the point of sharply diminishing returns, a point which precludes the necessary finding of substantiality.[9]

I therefore adhere to my prior finding that the award of damages to plaintiffs did not confer a common benefit, and deny the motion for an additional award of attorneys' fees.

---

[9] Plaintiffs advance two arguments that are beyond the scope of the Second Circuit's remand – that Judge Korman's finding that the injunction constituted a common benefit is "law of the case," which requires grant of all subsequent fee applications; and that this case is properly viewed as a unified whole rather than as separate liability and damages proceedings. Because the remand was limited to whether the damages phase of the litigation conferred a common benefit under Rodonich, see Ramey II, 362 Fed. Appx. at 217, those arguments will not be addressed. Moreover, the remand implicitly accepted that it was proper to view the damages phase of this litigation distinct from the liability phase. See id.

## CONCLUSION

For the reasons set forth above, plaintiffs Droz, O'Grady, Lowe and Simuta are entitled to the damages previously awarded them; and plaintiffs' application for attorneys' fees for the damages proceedings is denied. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

/s/(BMC)
U.S.D.J.

Dated: Brooklyn, New York
September 8, 2010